Good morning. Eric Guzman, Federal Defenders of San Diego, on behalf of the Appellant Ricardo Palos, may it please the Court. The tip the agents relied upon in this case to seize Mr. Palos was given by an anonymous, untraceable delivery driver. It did not give any meaningfully predictive information that was corroborated by Border Patrol agents. It bore no other indicia of reliability. It was therefore an unreliable tip. The seizure based on that tip was unreasonable and violated the Fourth Amendment. In your briefing, you do repeatedly say that the tip by the UPS driver was untraceable. But just sort of a common sense approach suggests that UPS would know what driver was on what route at what time of day. Why is it your view that it would not be possible to trace the individual who gave the tip? Well, I have a two-part response, Your Honor. First, there was no evidence generated at the evidentiary hearing that a UPS driver could be located. And secondly, as I pointed out in my, I believe, opening and implied brief, that to the extent that that's determinative to this Court, we're happy to call or have remand to present evidence because our subsequent investigation turned out that UPS, in fact, can't tell what driver was on the route at a certain time. And I understand it's not for... Did you submit evidence of untraceability? Was there evidence of untraceability at the trial? Or are you now just telling us after the fact? There was no evidence either way, but at the evidentiary hearing, the government had the burden to establish the reliability of this tip. They presented no evidence. They didn't bring this UPS driver or put forth any indication at all that you could trace a UPS driver. But Mr. Pauls is happy to have this case remanded for that issue. Yeah, but the question isn't really simply whether the UPS could tell you where the individual driver was at any particular time. I mean, it seems, again, to be a fair inference that maybe they don't know who was there at that moment, but they know who might have been in that area, and you could have... Certainly the individual driver would think that he was findable. He's talking to somebody face-to-face. They could survey the five people who could have been there and say who spoke to him. But somehow or other, it seems extremely unlikely that he could have believed that he could disappear into the ether. Well, I mean, I had no idea what was going through the mind of the UPS driver, and we don't know because he wasn't subpoenaed or brought to the hearing. But if he thought that or not, the fact remains that he didn't leave any contact information. There's no evidence to support the idea that they could have found this guy and held him accountable had he given false information. The evidence is, as I understand it, that it actually went over the police radio communications or the Border Patrol radio communications immediately that it was a UPS driver who had said this. Correct. So, I mean, that is at least some indication that there really was such a person. That what? I mean, that fulfills at least some of the role that anonymous, real anonymous tips don't have, i.e. there was at the time an indication of who it was who said this, not by name but by description. Correct. But I don't believe under this circuit's case law that that's enough to render reliable that they knew, A, that the tip, I guess, did actually occur and that it was by someone who worked for a huge company. What about the Sierra Hernandez case? Isn't that essentially on point? Well, this case is distinguishable in two main factors. In Sierra Hernandez, they distinguish and they look at Adams v. Williams and they say we're not going to adopt the per se rule of reliability or unreliability for anonymous tips or for face-to-face encounters, but there's two main facts that they kind of relied upon. The first was there was some set of exigency that excused the failure to take down contact information and they almost, it almost developed kind of like an extreme circumstance exception to what reasonable suspicions require. And why isn't that true here? These people were moving. You had to get to them. Well, in this case, Your Honor, there are many border patrol agents all along the relevant road and it's clear from the hearing that there were agents on both sides of the road and whereas the agent in Sierra Hernandez was by himself and of course it was reasonable for him to leave because he had to go to get to the scene of the crime and that excused him from knocking down contact information. In this case, Agent Simon, it's clear that they all had radio capability. He could have stopped. He could have asked for contact information, gotten some type of identification and then dispatched out, please watch this car. That's in fact what did happen. I mean, Agent Simon never even goes and has any contact to an agent to whom he supposedly already seized. So his role didn't help protect, didn't help further the investigation at all. He easily could have radioed out and asked people to follow that car while he took down the contact information, making the tip more reliable. And the second reason why this case is distinguished from Sierra Hernandez is the tipster was a lot more remarkable and the court found as a matter of law in that case that that tipster could have been traced because of his remarkable appearance and the fact that he had a then late model car and that's not the situation in our case. And lastly, Ron, in Sierra Hernandez, 30 years ago, the court pointed out that we're not sure exactly how reliable an anonymous tip needs to be for a carry stop. But the 30 years of case law since then and the two big Supreme Court cases, being Florida v. J.L. and Alabama v. White, I think have filled in the contours and answered the question that was somewhat left unanswered by Sierra Hernandez. Okay. Would you like to reserve some time for this? Yes, Your Honor. Thank you. Thank you. Ron. May it please the Court. I'm David Katz on behalf of the United States. Your Honors, as is pretty clear from the briefs and argument, the issue here is whether there was reasonable suspicion. And my opponent makes the same mistake as has been made in several other cases and discussed at length in the cases of both Arvizu and Thomas and Gerber. And that is that he tries to do what was described by the Supreme Court as divide and conquer by parsing each individual circumstance that the agents considered and arguing that those by themselves are simply not enough. The standard, however, is that the reasonable suspicion must be supported by specific articulable facts, together with objective and reasonable inferences drawn from those facts that form a basis for suspicion that someone has committed an offense. Again, it's the totality of the circumstances and viewed in a common-sense approach that include a number of the following which have been discussed at length in Gerber and Arvizu. First of all, look at the characteristics of the area. And we have an area that the agents described as being notorious for alien smuggling and transporting because of its proximity to the border and its location with respect to the checkpoint. The agent described that in his experience, in which he has been involved in for 18 months, probably thousands of apprehensions of illegal aliens, he said that the area in which he first encountered this vehicle and was forced to swerve off the road to avoid a head-on collision was west of a checkpoint. He described with some particularity the fact that the pattern that the smugglers use is that the aliens come across the border about five miles south of that location where there is simply a barbed wire fence, if that, that protects the border from illegal immigration from Mexico. So it is very easy to come across the border. The illegal aliens then travel north. They are picked up by vehicle. The vehicle is at that point east of the checkpoint, and it has to get on the main road going through the checkpoint. So what it does is, in their experience, they drop off the illegal aliens that they have in the vehicle east of the checkpoint. They tell the aliens to then walk around and cross an area above or below the checkpoint, and they will meet them at a certain specific location after they have gone through with an empty vehicle. They will then pick them up, and they will continue west towards San Diego, which is the destination. So in this particular case, we have an agent who, about 5 o'clock in the afternoon, is traveling east on a road west of the checkpoint. Can I ask something? Let's suppose all of this were true, and there was no tip from the UPS driver. Would there be reasonable suspicion? Your Honor, I'm a little hard of hearing. Let's suppose this was all true, everything that you're now describing, all the circumstantial stuff, but there was no tip from the UPS driver. Would there be reasonable suspicion? Not at that point, no. Okay. Suppose that there were a tip from an anonymous telephone tip. Would there be reasonable suspicion? Somebody just calls up and says, I just saw some people loaded onto this car, but there's no face-to-face looking. We don't have any idea how many people know it or anything like that. Would that be sufficient? I don't know whether that would be sufficient in that particular circumstance. No, without other factors. No. All right. So basically, you can go into the rest of it all you want, but everything is going to turn on the UPS driver, right? In other words, either this UPS tip is worth more, this kind of a tip is worth at least somewhat more than an anonymous phone call, or it isn't, and that's what we have to decide. Well, we have a situation, Your Honor, where the Border Patrol, even before he first encounters the UPS driver, has encountered a car going around a blind curve that is coming in the wrong direction. It's a two-lane road, and this guy is coming in the oncoming lane right toward him, having crossed over the double line, in again a blind turn with a 10- to 15-foot wall or ground area above it, so you can't see around it. So he almost hits the agent, smack head on. The agent swerves off the road to avoid it. The agent at that point is thinking to himself, this guy is in an awful big hurry. I wonder why. Then he encounters the UPS driver seconds later, who comes by following that car, truck, and the UPS driver points like this toward that vehicle and keeps going and following it. We also have a situation, Your Honor, where under normal circumstances, most drivers, if they were driving in such a manner as this guy had been driving, and they had forced a marked Border Patrol vehicle to swerve off the road, the ordinary behavioral pattern would be that they would stop. Was there testimony at trial that the agents in the exercise of their expertise say that smugglers typically speed on this road or any of the other? Was there anything else about the truck and the way it was driving erratically that flagged to the agents that this is evidence in their experience of smuggling behavior? Well, the road, which of course was also used by ordinary citizens who come going to and from work, going to and from recreational activity, but it is an area because of its location just west of the checkpoint, which is notorious for alien smugglers. But do they speed? Because I've certainly heard testimony that these cars or trucks were moving unusually slow, and that was evidence of smuggling. So what was it about the speeding that would be a factor? Well, the agent testified that at that particular time of the day, many people are driving home. In the morning, it was his experience that people drive faster because they're running late or they're in a hurry to get to work before they're late. In the afternoon, he said that it's his experience that people drive more slowly than normal. Right, but there are lots of bad drivers in the world. And again, and I'm sure there are lots of bad drivers down in this area. You know, I drive on Route 80 to work every morning. Every day there's somebody who's doing this. So that can't be it. Again, it has to come down eventually, as you said, to whether the UPS driver tip is worth more than if he was on the telephone. And that's what it would be helpful to me if you would address. If he was a completely anonymous person on the telephone. He wasn't. He was, first of all, he was physically present. Yeah, but it wasn't as if he were anonymous because I thought that the Border Patrol person, that he pointed at the car and then at the Border Patrol agent. He knew he was a Border Patrol agent and he was in a UPS truck. And the Border Patrol agent knew that he had seen the truck. So it was a little, it was right there. It wasn't just a phone call. Right. Right. And that's what I'm trying to say is that it doesn't seem to be helpful to be talking about all the rest of it. What is helpful is to explain why, and I think there may be very good reasons, why this interaction is different from an anonymous phone call. That's what I'd like to know. Well, frankly, Your Honor, I think that the UPS driver, the tip from the UPS driver who pulled off the road, went face-to-face with the agent, provided the information. There's no indication that he had any motive to make this. The agent was in a car? Was in a marked Border Patrol car? There were two marked Border Patrol vehicles on the side of the road by, I think they call it the Ride and Hike Gate. So they're about the side of the road. The UPS, they first see this vehicle that's been described by Agent Slaughton and come racing by, and a matter of seconds later, the UPS comes up behind him, pulls off right where their cars are parked, and tells them that he just saw this vehicle pick up what appeared to be a number of illegal aliens back further. And he wasn't doing it as an anonymous person. No. They could have asked him. They knew. They could have asked his name. They could have looked at the license plate. They could have looked. They didn't do any of those things, but they could have. Yes. And, in fact, Judge Miller found that this was not an anonymous tip, and it was a highly reliable source. And the Court, of course, reviews that for clear error. And there was no question in Judge Miller's mind as to the fact that this was a very highly reliable tip. It was not anonymous, no matter how much my opponent continued. Well, it was anonymous. They didn't actually know who he was, but presumably they. Technically. But in the sense that it wasn't a person trying to hide their identity because it could have been ascertained at that point. Correct. It was only anonymous in the sense that they didn't ask him his name at that particular point in time. But they certainly could have ascertained it later on if it was necessary to do so. It's not as if there are dozens and dozens of UPS trucks running around unaccounted for in this particularly rural area east of San Diego. So they could have found that out if they needed to do so. Okay. You've used your time. You've used your time. Oh, okay. Thank you. Thank you. Thank you. If I could address three points. First, as for the Biden, I believe the judge could have raised the question whether or not there's any evidence that it's usual for smugglers to speed. There was no evidence of that at trial. Not one agent testified that that's characteristic of smuggling. Second, I would just like to repeat that. There's been no evidence that this UPS driver could have been ascertained. And I think that's borne out by the fact that when I moved to the court. Certainly. What is your understanding of the reason for the anonymous tip rule? Why do we consider anonymous tips unreliable? I think every tip from a non-law enforcement has to have some type of shown reliability, being prior experience of getting accurate information by predicting something that evinces insider information like in Alabama v. White. Well, here we have somebody who bothered to stop, face-to-face said, I saw this, personally saw this thing happen. And there was certainly some reason to believe him because he was on the road at the same time as these trucks were. The other driver, the other border patrol person had seen him being quite close to that car at the time. So there was some reason to think that he could have seen what he said he saw. And moreover, he was standing there and if somebody wanted to say to him, you know, what's your name or look at his license plate or whatever, he wasn't hiding. Right? He was making no attempt to hide who he was. So if they wanted to ascertain who he was, they certainly could have. Well, Your Honor, I mean, there's no evidence in this record that he was putting out his name or that he was hiding it, that he didn't give a business card and say, here's my name. He was driving a car with a license plate and presumably a UPS truck number. I don't know that, but certainly a license plate. And he was standing there in front of live people who could have kept him there and the law enforcement could have said, all right, who are you? Your Honor, however, had they started asking for contact information, perhaps the UPS driver would have backed off. So I wasn't sure that they were Mexicans. I wasn't sure what was going on. I saw some people, maybe he could have started backing off at that point. The point is he didn't give any contact information. He didn't make himself liable for giving false information. He had a license plate on his car. Right? I assume. No one says he didn't. Well, no one says he isn't. There's no evidence that they could trace the actual driver from that license plate number or that it was taken down or they parked in a way to conceal that. I don't know where UPS trucks even keep their license plates at all. And if I could address the point that the government made regarding that there's not dozens of trucks on this rural area. This area is far from rural. All the agents testified at the hearing that there are many outdoor activities that occur on this road, hiking, fishing, hang gliding, and that there's a parking lot there for people to go enjoy the lake and that it connects two large cities, one of which Agent Padrón testified was perhaps developed for businesses and restaurants, et cetera. So it's not a rural area, and it's very reasonable that many UPS drivers would frequent this road. If you're honest, I know the questions. I say to you it's my time. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is United States v. Para-Islamos.
judges: Schroeder, Berzon, Ikuta